IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>SAMUEL RALPH JORDAN,<br><br>*Defendant.* | Criminal No. 2:23-cr-271 - 1<br><br>Hon. William S. Stickman IV |

**MEMORANDUM OPINION**

WILLIAM S. STICKMAN IV, United States District Judge

A federal grand jury indicted Defendant Samuel Ralph Jordan ("Jordan") with (1) knowingly possessing firearms and ammunition, in and affecting interstate commerce, knowing he had previously been convicted of a crime punishable by a term of imprisonment exceeding one year in violation of 18 U.S.C. § 922(g)(1) (Count One) and (2) knowingly and unlawfully possessing a firearm muffler or silencer as defined in 18 U.S.C. § 921(a)(3)(C) and 26 U.S.C. § 5845(a) which was not registered to him in the National Firearms Registration and Transfer Record in violation of 26 U.S.C. § 5861(d) (Count Two). (ECF No. 3). Jordan filed a Motion to Dismiss Indictment (ECF No. 50) arguing that Count One of the Indictment must be dismissed because it violates the Second Amendment, the Due Process Clause, and the Commerce Clause. He also moved to dismiss Count Two of the Indictment arguing that "the fuel filter" he is charged with possessing is not a prohibited firearm muffler or silencer. (*Id.*). For the following reasons, the Court will deny Jordan's motion.

1

## I.    STANDARD OF REVIEW

The Federal Rules of Criminal Procedure require that an indictment be a plain, concise, and definite written statement of the essential facts constituting the offense charged.  FED. R. CRIM. P. 7(c)(1).  An indictment is sufficient if it (1) includes the elements of the offense intended to be charged, (2) apprises the defendant of what he must be prepared to defend against at trial, and (3) enables him to plead a former acquittal or conviction in the event of a subsequent prosecution.  *United States v. Rawlins*, 606 F.3d 73, 78-79 (3d Cir. 2010); *United States v. Vitillo*, 490 F.3d 314, 321 (3d Cir. 2007).  An indictment that fails to charge all elements of a crime must be dismissed.  *United States v. Cochran*, 17 F.3d 56, 57 (3d Cir. 1994).  "No greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution."  *United States v. Rankin*, 870 F.2d 109, 112 (3d Cir. 1989).  The Government is not required to provide precise details because the indictment "need not specify the theories or evidence upon which the government will rely to prove" its case.  *United States v. Cochrane*, 985 F.2d 1027, 1031 (9th Cir. 1993).  A defendant is entitled to notice of the charges he faces, not "to know all of the evidence the government would use to prove the charges against him."  *United States v. Mancuso*, 718 F.3d 780, 790 (9th Cir. 2013).

A motion to dismiss an indictment is governed by Federal Rule of Criminal Procedure 12 ("Rule 12") which states: "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  FED. R. CRIM. P. 12(b)(1).

> [T]he scope of a district court's review at the Rule 12 stage is limited.  "[A] pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence."  *United States v. DeLaurentis*, 230 F.3d 659, 660 (3d Cir. 2000) (citations omitted).  "The government is entitled to marshal and present its evidence at trial, and have its sufficiency tested by a motion for acquittal pursuant to Federal Rule of Criminal

Procedure 29." *Id.* at 661. There is no criminal corollary to the civil summary judgment mechanism. *Id.* In evaluating a Rule 12 motion to dismiss, a district court must accept as true the factual allegations set forth in the indictment. *United States v. Sampson*, 371 U.S. 75, 78–79, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962); *United States v. Besmajian*, 910 F.2d 1153, 1154 (3d Cir. 1990). "Evidentiary questions—such as credibility determinations and the weighing of proof—should not be determined at this stage." *Bergrin*, 650 F.3d at 265 (internal marks and citation omitted). Thus, a district court's review of the facts set forth in the indictment is limited to determining whether, assuming all of those facts as true, a jury could find that the defendant committed the offense for which he was charged. *Panarella*, 277 F.3d at 685; *DeLaurentis*, 230 F.3d at 660.

*United States v. Huet*, 665 F.3d 588, 595-96 (3d Cir. 2012), *abrogated on other grounds*.

## II. ANALYSIS

### A. Count One – 18 U.S.C. § 922(g)(1)

i.  <u>As-Applied Challenge to § 922(g)(1)</u>[1]

Jordan argues that § 922(g)(1) is unconstitutional as applied to him because the Government has not shown that he "continues to present a special danger of misusing firearms" or "in other words" that "he would likely pose a physical danger to others if armed." (ECF No. 50, p. 12 (citing *Pitsilides v. Barr*, 128 F.4th 203, 210 (3d Cir. 2025))); (ECF No. 99, pp. 2-6). He contends that his past convictions are over seventeen years old and "did not plausibly involve the use of force or physical injury." (*Id.* at 13). The Government counters that § 922(g)(1) is constitutional as applied to Jordan's possession of firearms because he has been convicted of

---

[1] The Court acknowledges Jordan's argument that *Pitsilides v. Barr*, 128 F.4th 203 (3d Cir. 2025) was wrongly decided. (ECF No. 50, p. 12; ECF No. 99, pp. 1-2). It expresses no view on this issue and will not address this argument. The decisions of the United States Court of Appeals for the Third Circuit bind the Court. *See In re Asbestos Prods. Liab. Litig. (No. VI)*, 384 F. Supp. 3d 532, 544 (E.D. Pa. 2019) ("The district court is the lowest court in our federal hierarchical system and is bound by rulings of its circuit court and the Supreme Court.").

serious crimes including criminal trespass, receiving stolen property, terroristic threats, and simple assault. (ECF No. 61, p. 21).[2]

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. In 2008, the Supreme Court of the United States held that, "on the basis of both text and history," the Second Amendment protects *an individual's* right to keep and bear arms. *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). The Supreme Court made clear, however, that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. Relevant to the instant motion, the Supreme Court stated:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 625–27. It further noted that "these presumptively lawful regulatory measures" were only examples and not an exhaustive list. *Id.* at 627, n.26. "[T]here will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Id.* at 635.

---

[2] Jordan's alleged possession of a firearm silencer or muffler is not protected by the Second Amendment. *United States v. Berger*, 715 F. Supp. 3d 676, 702 (E.D. Pa. 2024) ("[A] silencer is not a bearable 'Arm' under the Second Amendment because it is merely an accessory which is unnecessary to the essential operation of a firearm."); *see also United States v. Saleem*, 659 F. Supp. 3d 683, 698 (W.D.N.C. 2023), *aff'd*, 2024 WL 5084523 (4th Cir. Dec. 12, 2024) ("[S]ilencers are neither arms nor reasonably necessary accoutrements within the purview of the Second Amendment."); *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) ("A silencer is a firearm accessory; it's not a weapon in itself . . . . Accordingly, it can't be a 'bearable arm' protected by the Second Amendment. Thus, because silencers are not 'bearable arms,' they fall outside the Second Amendment's guarantee.").

In June 2010, the Supreme Court held that the Second Amendment right, elucidated in *Heller*, is incorporated against the states. *See McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010). More specifically, it held that the "the right to keep and bear arms for the purpose of self-defense" in the home recognized by the Second Amendment "is fully applicable to the states." *Id*. The Supreme Court reiterated its observations in *Heller* that the right protected by the Second Amendment (like the rights protected elsewhere in the Constitution) is not unlimited and stated plainly: "We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' We repeat those assurances here." *McDonald*, 561 U.S. at 786 (quoting *Heller*, 544 U.S. at 626-27). "[I]ncorporation does not imperil every law regulating firearms." *Id*.

Prior to 2022, courts within the United States Court of Appeals for the Third Circuit applied a "means-end scrutiny" analysis in Second Amendment cases. *See Lara v. Comm'r of Pennsylvania State Police*, 125 F.4th 428, 433 n.9 (3d Cir. 2025) (citing cases). In 2022, the Supreme Court articulated an approach to addressing challenges invoking the Second Amendment in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). It rejected tests developed by the appellate courts that employed a "means-end scrutiny." *Id*. at 17-20. In their place, the Supreme Court articulated a new test:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 17 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)). *Bruen* does not explicitly address the propriety of firearm possession bans for persons previously convicted of a felony crime; however, it refers to those falling under the protection of the Second Amendment as "law-abiding" people. Thus, *Bruen* does not upset the Supreme Court's consistent endorsement of felon disarmament. The Supreme Court explicitly stated that it is "[i]n keeping with *Heller*." *Id.*

Then, in *United States v. Rahimi*, 602 U.S. 680, 692 (2024), the Supreme Court clarified that "the appropriate analysis" under *Bruen*'s second step "involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." Thus, challenged regulations are evaluated at a higher level of generality than whether "those regulations [are] identical to ones that could be found in 1791." *Id.* Rather than seeking out a perfect statutory analogue, "dead ringer," or "historical twin," courts must draw on "relevantly similar" historical regulations to derive "principles underlying the Second Amendment" and then ask if the modern-day regulation "comport[s] with th[ose] principles" in terms of "why and how it burdens the Second Amendment right." *Id.* Ultimately, the Supreme Court affirmed the denial of a motion to dismiss a defendant's indictment, holding, "[w]hen a restraining order contains a finding that an individual poses a credible threat to the physical safety of an intimate partner, that individual may–consistent with the Second Amendment–be banned from possessing firearms while the order is in effect." *Id.* at 690.

Following the *Rahimi* decision, the Third Circuit directly applied *Bruen* in *Range v. Attorney Gen. United States of Am.*, 124 F.4th 218 (3d Cir. 2024) ("*Range II*"). The Third Circuit evaluated an as-applied challenge under *Bruen* to the prohibition on felons possessing guns in § 922(g)(1). Range pleaded guilty in 1995 to making a false statement to obtain food

6

stamps. At the time he pleaded guilty, his conviction was considered a misdemeanor punishable by up to five years of imprisonment. Thus, his conviction precluded him from possessing a firearm under § 922(g)(1). *Id.* at 223. To reemphasize – Range was not a felon; he committed a nonviolent misdemeanor offense relating to false statements on paperwork for public benefits. Range wanted to possess a hunting rifle and a shotgun for home defense, so he sought a declaration that § 922(g)(1) violates the Second Amendment as applied to him.

The Third Circuit applied the *Bruen* analysis and ruled in Range's favor. After determining that Range was one of "the people" to whom the Second Amendment applies, and his proposed conduct (owning a hunting rifle) was protected by the Second Amendment, the Third Circuit then asked whether the Government carried its burden to justify stripping Range of that right. *Id.* at 226-28. In order to justify § 922(g)(1), as it applied to Range, the Government needed to show that the statute was "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 228 (quoting *Bruen*, 597 U.S. at 24). The Third Circuit determined that the Government had not met its burden because a review of sources from the founding era and early Republic do not reveal that the disarmament of people like Range was practiced or contemplated. Rather, a review of those sources demonstrated that at the time of the ratification of the Second Amendment, disarmament was limited to individuals who were viewed as dangerous to the community. *Id.* at 229-31. In other words, the Third Circuit held that the Government failed to show that the historical tradition of firearms regulation would have deprived Range of his Second Amendment right to possess a firearm in light of his conviction for making false statements on an application for public benefits.

The Third Circuit in *Pitsilides v. Barr*, 128 F.4th 203 (3d Cir. 2025) summarized all of the above law as follows:

The upshot of these cases is threefold: First, as *Bruen* and *Rahimi* make clear, our inquiry into principles that underlie our regulatory tradition does not reduce historical analogizing to an exercise in matching elements of modern laws to those of their historical predecessors. Instead, we must consider whether the principles embodied in different strands of historical firearm regulations, "[t]aken together," *Rahimi*, 602 U.S. at 698, 144 S.Ct. 1889, support contemporary restrictions, all the while remaining vigilant "not to read a principle at such a high level of generality that it waters down the right," *id.* at 740, 144 S.Ct. 1889 (Barrett, J., concurring).

Second, whatever other recourse may or may not be available, felons seeking to challenge the application of § 922(g)(1) at least may bring declaratory judgment actions. But to grant such relief, the record must be sufficient for a court to make an individualized determination that the applicant does not presently pose the kind of danger envisioned by *Rahimi* and *Range II*. In keeping with *Heller's* conclusion that "the Second Amendment confers an individual right to keep and bear arms," 554 U.S. at 622, 128 S.Ct. 2783, that determination necessarily demands individualized fact-finding.

Third, while *Rahimi* and *Range II* did not purport to comprehensively define the metes and bounds of justifiable burdens on the Second Amendment right, they do, at a minimum, show that disarmament is justified as long as a felon continues to "present a special danger of misus[ing firearms]," *Rahimi*, 602 U.S. at 698, 144 S.Ct. 1889, in other words, when he would likely "pose[ ] a physical danger to others" if armed, *Range II*, 124 F.4th at 232. Indeed, as Judge Bibas presciently observed even before *Bruen*, "[a]s an original matter, the Second Amendment's touchstone is dangerousness," *Folajtar v. Att'y Gen.*, 980 F.3d 897, 924 (3d Cir. 2020) (Bibas, J., dissenting); *see also Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting) ("[L]egislatures have the power to prohibit dangerous people from possessing guns."), and our sister circuits have articulated the principle similarly in light of *Rahimi*, *see United States v. Bullock*, 123 F.4th 183, 185 (5th Cir. 2024) (per curiam) ("The historical record demonstrates 'that legislatures have the power to prohibit dangerous people from possessing guns.'" (quoting *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting))); *United States v. Williams*, 113 F.4th 637, 657 (6th Cir. 2024) ("[O]ur nation's history and tradition demonstrate that Congress may disarm individuals they believe are dangerous."); *United States v. Jackson*, 110 F.4th 1120, 1128 (8th Cir. 2024) ("Legislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed.").

*Id.* at 210–11.

For the following reasons, the Court holds that Jordan's "as applied" challenge fails. The threshold question is whether Jordan is one of "the people" protected by the Second Amendment

despite having a prior felony conviction. The Government concedes that Jordan is protected. (ECF No. 61, p. 20). The Court holds that as an adult American, Jordan is among the people presumptively protected by the Second Amendment. *See Lara*, 125 F.4th at 438-39 (holding that all adult Americans are presumptively among "the people" to whom Second Amendment rights extend); *see also United States v. Moore*, 111 F.4th 266, 269 (3d Cir. 2024) ("As an adult citizen, Moore is one of the 'people' whom the Second Amendment presumptively protects."); *Range II*, 124 F.4th 218 (rejecting the argument that "the people" includes only law-abiding citizens); *Heller*, 554 U.S. at 580-81 (explaining that "'the people' as used throughout the Constitution unambiguously refers to all members of the political community, not an unspecified subset").

Having determined that Jordan is one of "the people," the next questions are whether "'the Second Amendment's plain text covers [Jordan's] conduct,' and 'the Constitution presumptively protects that conduct.'" *Bruen*, 597 U.S. at 17-19. The Third Circuit in *Pitsilides* directed:

> Courts adjudicating as-applied challenges to § 922(g)(1) must consider a convict's entire criminal history and post-conviction conduct indicative of dangerousness, along with his predicate offense and the conduct giving rise to that conviction, to evaluate whether he meets the threshold for continued disarmament. As *Range II* illustrated, consideration of intervening conduct plays a crucial role in determining whether application of § 922(g)(1) is constitutional under the Second Amendment. *See* 124 F.4th at 232. Indeed, such conduct may be highly probative of whether an individual likely poses an increased risk of "physical danger to others" if armed. *Id.*

*Pitsilides*, 128 F.4th at 212. Consequently, the Court will consider Jordan's alleged criminal conduct and his criminal history.[3]

---

[3] The Court is able to make factual determinations without an evidentiary hearing. Jordan acknowledges that the Government "attached whole cloth the court files from [his] prior criminal cases, including police reports and probable cause affidavits." (ECF No. 99, p. 11). Nevertheless, he takes issue with the Government relying on these records to summarize the facts underlying his convictions, and he wants a hearing to "challenge these records." (*Id.*).

The Government has represented that it is prepared to show the following facts:

On November 26, 2020, a Customs and Border Protection (CBP) Officer seized a shipment containing one firearm silencer during examination of international mail parcels from China at the John F. Kennedy International Mail Facility in Jamaica, New York. The suppressor was in an international mail parcel originating from China. The package containing the suppressor was addressed to Samuel Jordan at an address in Hopwood, Pennsylvania. The customs tag declared the package to contain a "Fuel Filter." CBP seized the package as a prohibited importation in violation of 19 U.S.C. § 1595a(c)(1)(C) and 49 U.S.C. § 80302(a)(2).

. . . .

Based on his review of Jordan's package and its contents, the information from CBP about the seizure of other firearm suppressors, and information from the ATF explaining how items labeled as "fuel filters" are sometimes possessed with the intent to be used as firearm silencers, [the HIS agent] prepared an affidavit seeking issuance of a search warrant that he presented to U.S. Magistrate Judge Patricia Dodge on January 13, 2021. . . . . The affidavit sought an anticipatory search warrant to search the listed locations, including Jordan's residence, for fruits, proceeds, and instrumentalities of violations of various firearm crimes upon the triggering event of the parcel being accepted and taken into the premises. Judge Dodge found the affidavit established probable cause and issued a search warrant on January 13, 2021.

. . . .

On January 14, 2021, HSI Pittsburgh agents, along with ATF, U.S. Postal Inspection Service (USPIS), the Pennsylvania State Police (PSP) and the Pennsylvania Game Commission conducted a controlled delivery of the seized silencer. At approximately 1546 hours, the USPIS Inspector acting in an undercover capacity as a USPS letter carrier delivered to Jordan's address the package containing the silencer. Jordan's wife (Tiffany Jordan) answered the door and accepted the package. Thereafter, agents presented the warrant and proceeded to execute the search. . . . In the master bedroom, agents found the following firearms, ammunition, and accessories: 1) one Glock 23 (.40 caliber) pistol, with a magazine, which was found on the right nightstand; 2) one ABC 15 (AR-15 style) rifle, with a scope, associated magazines, and an exchangeable

---

Unlike the situation in *Pitsilides*, where the Third Circuit held that the record was insufficient to determine whether an illegal gambling conviction involved "conduct that endangers the physical safety of others," the Court holds that the records of Jordan's previous convictions makes that fact clear. *Pitsilides* recognizes that "some offenses may offer conclusive evidence that someone poses such a danger." *Pitsilides*, 128 F.4th at 211. The Court holds that Jordan's previous convictions do so. As explained herein, they are the sort that involve actual and threatened violence, as well as the type of criminal mayhem that readily leads to violence or otherwise endangers the public. *See United States v. Williams*, 113 F.4th 637, 659 (6th Cir. 2024) (recognizing that disarmament is appropriate for crimes that "do not always involve an immediate and direct threat of violence" but "may nonetheless pose a significant threat of danger.")

compensator installed on the end of the barrel, which was found on the bed, in an opened carry case; 3) one Ruger EC92 (9mm) pistol, with magazine, which was found on the left nightstand; 3) one Winchester, Model 1300 (12 GA), shotgun; 4) one Savage bolt action rifle (.30-06), with scope and magazine; 5) one Remington, Model 5 22 Viper (.22LR caliber), semi-automatic rifle, with magazine; 6) one Marlin, Model 336W (.30-.30), lever action rifle; and 7) two pieces of Armored Republic AR500 body armor, found in a tactical carrier with the rifle and pistol magazines.

(ECF No. 61, pp. 2, 4-6 (footnote omitted)).  Jordan has not argued that he possessed the gun for self-defense purposes.  It would be difficult for him to advance such an argument as he is classified as a person prohibited from possessing a firearm by virtue of his criminal history.

The Government provided the following summary of Jordan's prior felonious conduct underlying the instant charge:

> On April 30, 2002, he was convicted in the Court of Common Pleas of Greene County of making terroristic threats in violation of 18 Pa. Cons. Stat. § 2706, a first-degree misdemeanor.  The conviction records reflect that Jordan called four times within ten minutes and left a message on the answering machine of the father of a woman who had a protection from abuse order against Jordan. Jordan's message said "that's one person to assassinate."  Jordan pled guilty to communicating a threat to assassinate the father with the intent to terrorize him. For his first crime, Jordan was sentenced to 12 months' probation. The maximum sentence for a first-degree misdemeanor is five years imprisonment. 18 Pa. Cons. Stat. § 923(7).
>
> On July 22, 2002, after a guilty plea, Jordan was convicted in the Court of Common Pleas of Fayette County of simple assault in violation of 18 Pa. Cons. Stat. 2701(a)(1), a second-degree misdemeanor.  The complaint reflects that Jordan struck his then girlfriend in the face and bit her on the neck, leaving visible injuries to her face including swelling and bruising.  The assault occurred after Jordan and his girlfriend had a verbal argument about her taking sides in an argument with her friends. Jordan was sentenced to two years' probation for the assault, a sentence that was to run concurrently with the period of probation imposed for the Greene County conviction. The maximum sentence for a second-degree misdemeanor is two years imprisonment. 18 Pa. Cons. Stat. § 923(6).[4]

---

[4] The Indictment does not include this simple assault conviction.  (ECF No. 3).  Courts have repeatedly held that they may take judicial notice of prior convictions in deciding a motion to dismiss an indictment. *See e.g. United States v. Mollett*, 2025 WL 564885, at *4 (W.D. Pa. 2025) ("[T]here is precedent, with which this Court agrees, for considering a defendant's criminal record when analyzing an 'as-applied challenge to a pending charge under §

11

As to his third crime, on December 16, 2005, he was convicted in the Court of Common Pleas of Fayette County of receiving stolen property in violation of 18 Pa. Cons. Stat. § 3925, a first-degree misdemeanor. Conviction records reflect that Jordan and another individual drove up to a private residence, pried open a dog pen, and stole two nine-week old boxer puppies valued at $750 from the residence. Jordan then sold one of the puppies to a third individual for $200. Jordan pled guilty to the offense and was sentenced to three years' probation.

While he was on probation, Jordan committed his fourth prior offense. He was convicted on July 27, 2007[,] in the Court of Common Pleas of Fayette County of criminal trespass in violation of 18 Pa. Cons. Stat. § 3503(a)(1)(i), a third-degree felony. The conviction records reflect that Jordan and another male entered a privately-owned building without authorization. One of the building's owners was driving by the building, which was under renovation, and saw Jordan enter the building then walk out the front door sometime later, after which time he was apprehended by law enforcement. Jordan was sentenced to a term of imprisonment of one to three months. At the sentencing hearing, Jordan was advised of the seriousness of his criminal trespass crime, and that it constituted a "felony of the third degree, punishable by a term of imprisonment of up to seven years . . . ." As a result of the 2007 conviction, Jordan's prior term of probation was revoked and he was sentenced to imprisonment for a period of between six and twenty-three months, which was to run concurrent to the term of imprisonment imposed for the trespass.

(*Id.* at 16-18 (internal citations omitted)).

Jordan's criminal history demonstrates that he has engaged in conduct reasonably likely to cause danger to life and limb and general mayhem. Further, it indicates a potential for violence. Courts have found that the specific crimes for which Jordan has been convicted

---

922(g)(1).'") (quoting *United States v. Adams*, 2024 WL 54112, at *2 (M.D. Pa. 2024)); *Adams*, 2024 WL 54112, at * 2 ("Following *Range [I]*, numerous decisions in the district courts have looked beyond the indictment to determine whether § 922(g)(1) is unconstitutional as applied to each of those defendants on motions to dismiss or subsequent motions for reconsideration.") (collecting cases); c*f. Williams*, 113 F.4th at 662 (6th Cir. 2024) ("Nor is it a problem – statutory or evidentiary – that the government failed to list a specific predicate felony in his indictment. From a statutory standpoint, the 'specific name or nature' of a defendant's prior felony conviction isn't an element of § 922(g)(1)."); *id.* at 660, 662 (explaining that "Courts may consider any evidence of past convictions in the record, as well as other judicially noticeable information – such as prior convictions – when assessing a defendant's dangerousness" and that "a court can accept prior convictions without an evidentiary hearing or jury fact finding."). The Court holds that the Government's failure to set forth this conviction in the Indictment does not require dismissal of the Indictment and that it may take this conviction into account when deciding Jordan's as-applied challenge.

indicate that an individual poses a danger of misusing firearms in a way that would endanger others. *See United States v. Bost*, 2023 WL 7386567, at *2 (W.D. Pa. Nov. 8, 2023) ("In short, [the defendant's] prior conviction for making terroristic threats makes him 'a potential danger to society [who] cannot be trusted to obey firearm regulations' such as § 922(g)(1)."); *United States v. Johnson*, 2023 WL 6321767, at *3 (E.D. Pa. Sept. 27, 2023) ("[The defendant's] prior convictions are for unlawfully carrying firearms and receiving stolen property. Those convictions indicate that he presents a potential danger to society and cannot be trusted to obey firearm regulations." (internal citations omitted)); *United States v. Naylor*, 2023 WL 7166452, at *4 (W.D. Pa. Oct. 31, 2023) (holding that, in addition to other crimes, the defendant's criminal trespass conviction "clearly demonstrate[s] that he is a threat to public safety and to the orderly functioning of society"); *United States v. Roach*, 2025 WL 871618, *3 (E.D. Pa. Mar. 20, 2025) (stating that "even a conviction for simple assault. . . demonstrates a defendant's dangerousness"); *United States v. Cooper*, 2025 WL 611044, *2 (E.D. Pa. Feb. 25, 2025) (stating that the elements of simple assault "speak directly to the physical threat that an individual poses to another and demonstrate that the person might engage in the types of confrontations that can escalate").

Jordan's simple assault conviction was based on striking his girlfriend in the face and biting her neck, leaving visible injuries on her face. (ECF No. 61, pp. 16-17). The assault resulted from a verbal argument which escalated into physical violence. (*Id.*). The Court agrees with its colleague, United States District Court Chief Judge Cathy Bissoon, that:

> Notions of morality and decency aside, violence against children and family members - often the most vulnerable populations - offends the law. It does now, and it has through the centuries. *See U.S. v. Jackson*, 138 F.4th 1244, 1254 (10th Cir. 2025) (holding same regarding "judicial determinations [that the defendant] engaged in violence against a family member or an intimate partner") (citation and original quotations omitted); *U.S. v. Gailes*, 118 F.4th 822, 827 (6th Cir.

13

2024) ("Domestic-violence convictions generally involve some sort of physical force," and, "[w]hen the presence of a gun accompanies the use of physical force, the likelihood that abuse turns to homicide greatly increases.") (citations omitted); *U.S. v. Watson*, 2025 WL 833246, *2 (6th Cir. Mar. 17, 2025) (the defendant's domestic violence conviction under Ohio law meant that he "caused or attempted to cause physical harm, or recklessly caused serious physical harm, to a family or household member," thus supporting a finding of dangerousness under § 922(g)(1), as applied); *U.S. v. Vecera*, 2025 WL 758808, *7 (W.D. Tex. Feb. 17, 2025) (disarmament was constitutional because the defendant pleaded guilty to a Texas criminal statute prohibiting the violation of a bond condition "designed to protect vulnerable family members").

*United States v. Graves*, 2025 WL 1784933, at **4-5 (W.D. Pa. June 29, 2025). Jordan's past crimes did (or could have) put another's safety at risk. Therefore, a finding of danger is justified. The Court holds that Jordan poses a danger of misusing firearms in a way that would endanger others.

Relatedly, the Court finds that Jordan is unlike Range, a civil litigant seeking a declaratory judgment in order to purchase a hunting rifle. Range had one prior conviction for making a false statement to procure food stamps. *Range II*, 124 F.4th at 222-23. Jordan is charged with being a felon in possession of firearms. He has prior convictions for terroristic threats, simple assault, receiving stolen property, and criminal trespass. Further, Jordan did not file a civil lawsuit to assert his Second Amendment claim but "knowingly violated § 922(g)(1)'s prohibition while subject to it." *See Pitsilides*, 128 F.4th at 210. This knowing violation of federal criminal law shows that Jordan poses risk of unlawful violence toward others. The Third Circuit's narrow holding that § 922(g)(1) was unconstitutional as applied to Range does not extend to Jordan, who is differently situated.

The Court holds that § 922(g)(1) is constitutional as applied to Jordan.

14

ii.    <u>Facial Challenge to § 922(g)(1)</u>[5]

Jordan further argues that § 922(g)(1) is facially unconstitutional because it (1) is not supported by founding-era analogues, (2) is unconstitutionally vague, and (3) exceed Congress's power under the original public meaning of the Commerce Clause.  (ECF No. 50, pp. 15-18).  The Court will address each argument.

*1.  Founding Era History*

Jordan argues that § 922(g)(1) is facially unconstitutional because the Government has not established a founding-era tradition of disarming individuals with felony convictions.  (*Id.* at 15).  The Government counters that Jordan's facial challenge fails because it has established historical analogues and, further, Jordan cannot establish that § 922(g)(1) is unconstitutional in all circumstances.  (ECF No. 61, p. 32).

The Court holds that § 922 (g)(1) is not facially unconstitutional as § 922(g)(1)'s ban on firearm possession is consistent with our country's historic tradition of regulating firearms. While, as *Range* observed, there is no historical tradition from the colonial era or early Republic categorically disarming those merely convicted of crimes (particularly, crimes relating to the sort of conduct that Range committed), there is a long history of disarming people who pose a danger to society.  As early as the seventh century, English law permitted the disarmament of violent and dangerous people.  Joseph G.S. Greenlee, *The Historical Justification for Prohibiting*

_____

[5] "A party asserting a facial challenge 'must establish that no set of circumstances exists under which the [challenged statute] would be valid.'" *United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  The Court's holding that § 922(g)(1) is constitutional as applied to Jordan forecloses any facial challenge to the statute because he cannot show § 922(g)(1) is unconstitutional in all circumstances if there is a circumstance in which the statute is constitutionally applied. *See United States v. Blackshear*, 2023 WL 5985284, at *3 (E.D. Pa. Sept. 14, 2023) ("[The defendant] cannot show that § 922(g)(1) is unconstitutional as applied to his case, let alone in all circumstances."). Nonetheless, the Court will briefly address Jordan's facial challenges to § 922(g)(1).

*Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249, 258 (2020) (citing *Ancient Laws and Institutes of England* 3 (Benjamin Thorpe ed., 1840) (describing the Laws of King Aethelberht as banning the provision of arms to another "where there is strife"). A millennium later, in the seventeenth century, King Charles II ordered the Lord Mayor of London to disarm "dangerous and disaffected persons." *Id.* at 259 (citing 10 *Calendar of State Papers, Domestic Series, Domestic Series of the Reign of Charles II, 1660-1670* 237 (1895)). This included Catholics who, following the failed gunpowder plot, were viewed as disloyal and potentially dangerous. *Id.* at 258 (citing 1 *Stuart Royal Proclamations: Royal Proclamations of King James I 1603-1625*, 247-48 (June 2, 1610) (James F. Larkin & Paul I. Hughes eds., 1973)).

Colonial laws mirrored English models and similarly disarmed those persons viewed as a danger to public order, including Native Americans, Catholics, Quakers, enslaved persons, and freed Black people. Such laws imposing discriminatory class-wide disarmament would undisputedly fail both moral and constitutional scrutiny under modern standards. Nevertheless, they demonstrate that at the time of the founding, the American colonists were accustomed to laws depriving persons who they perceived as posing a special threat to society from possessing firearms. Colonial laws also disarmed those whose actions made them a danger to the community. Laws passed in Massachusetts and New Hampshire forbade the carrying of arms "in an aggressive and terrifying manner." *Id.* at 262. Likewise, Virginia allowed the disarmament of those "who ride, or go, offensively armed, in Terror of the People." *Id.* at 262 (citing George Webb, *The Office of Authority of a Justice of the Peace* 92-93 (1736)).

At the time of the ratification of the Second Amendment, the framers and the people understood that the right to keep and bear arms extended to all "peaceable" citizens. Greenlee, *The Historical Justification*, 20 WYO. L. REV. at 266 (citing 2 BERNARD SCHWARTZ, THE BILL OF

16

RIGHTS: A DOCUMENTARY HISTORY 675 (1971)); *see also* Stephen Halbrook, THAT EVERY MAN BE ARMED 86 (revised ed. 2013) ("[T]he Second Amendment...originated in part from Samuel Adams's proposal . . . that Congress could not disarm any peaceable citizens."). Samuel Johnson's dictionary from the time of ratification defined "peaceable" as "1. Free from war; free from tumult; 2. Quiet; undisturbed; 3. Not violent; not bloody; 4. Not quarrelsome; not turbulent." 2 Samuel Johnson, A DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 1773).[6] The prevailing view that "peaceable" citizens were secure in their right to keep and bear arms excluded those who did not fall within that definition—those who were, conversely, dangerous. As Third Circuit Judge Thomas M. Hardiman's concurring opinion in *Binderup v. Att'y Gen. United States of America*, 836 F.3d 336, 368 (3d Cir. 2016) observed:

> [T]he debates from the Pennsylvania, Massachusetts and New Hampshire ratifying conventions, which were considered "highly influential" by the Supreme Court in *Heller*...confirm that the common law right to keep and bear arms did not extend to those who were likely to commit violent offenses. Hence the best evidence we have indicates that the right to keep and bear arms was understood to exclude those who presented a danger to the public.

(internal citations omitted).

The disarming of people who pose a danger to society is deeply rooted in our country's legal traditions. "The right to keep and bear arms always has been subject to careful limitations," which "are at their zenith when applied to people who are the antithesis of the law-abiding citizen who wants to exercise his or her right to self-defense, whether at home or in public, and who may also enjoy the various sports and other activities that involve guns." *Atkinson v. Garland*, 70 F.4th 1018, 1037 (7th Cir. 2023) (Wood, J., dissenting). Holding that § 922(g)(1) is facially unconstitutional would strip Congress of its ability to protect the public from a clear and

---

[6] Johnson's dictionary is an authoritative resource for the meaning of words as understood by the founding generation. The Supreme Court cited to it in *Heller* to interpret the language of the Second Amendment. *See Heller*, 554 U.S. at 582-84.

17

present danger. That is not something that the Court is willing to condone. The Court finds that there are founding-era analogues for disarming individuals who pose a danger to society and that § 922(g)(1) is not facially unconstitutional.

### 2. Vagueness

Jordan argues that § 922(g)(1) is unconstitutionally vague. (ECF No. 50, pp. 16-17). The Government counters that § 922(g)(1) is not vague because "it clearly criminalizes possession of a firearm by any person who 'has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year.'" (ECF No. 61, p. 32).

The Court holds that § 922(g)(1) is not unconstitutionally vague. "A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). In resolving a vagueness challenge, courts consider "whether [the] statute is vague as applied to the particular facts at issue, for '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *Holder v. Humanitarian L. Project*, 561 U.S. 1, 18-19 (2010) (internal quotation marks omitted). The "mere fact that close cases can be envisioned" is not sufficient to render a statute vague because "[c]lose cases can be imagined under virtually any statute." *Williams*, 553 U.S. at 305-06.

"'Section 922(g)(1) is not vague as it clearly bars the possession of a firearm by any person who has previously been convicted of a crime punishable by more than one year in prison (or of certain misdemeanors as specifically defined).'" *United States v. Johnson*, 2025 WL 276752, at *4 (W.D. Pa. Jan. 23, 2025) (quoting *United States v. Ames*, 2023 WL 5538073, at *3

(E.D. Pa. Aug. 28, 2023)).  Further, because § 922(g)(1) contains a *mens rea* element (the Government must prove that the defendant actually knew that he had been convicted of a crime punishable by a term of imprisonment exceeding one year), it is "less likely that a defendant will be convicted for an action that he or she committed by mistake." *United States v. Fullmer*, 584 F.3d 132, 152 (3d Cir. 2009).  Such fact alleviates vagueness concerns.  *Id.*  Moreover, § 922(g)(1) is not vague as applied to the particular facts at issue. The plain text of the statute elucidates that a convicted felon is prohibited from possessing a firearm.  The statute applies to Jordan given his prior convictions and the danger he poses to others if he were armed.

### 3.  The Commerce Clause

In purporting to raise the argument for preservation purposes, Jordan argues that § 922(g)(1) is inconsistent with the original public meaning of the Constitution's Commerce Clause. (ECF No. 50, p. 18).  In doing so, Jordan concedes that "the Supreme Court's post-New Deal precedents continue to foreclose this Court from second-guessing their broader view of Congress's power to regulate commerce." (*Id.*).  He is correct. *See United States v. Singletary*, 268 F.3d 196, 204 (3d Cir. 2001).  This argument is foreclosed by binding precedent and does not provide a basis to dismiss the charge against him.

### B.  Count Two - 26 U.S.C. § 5861(d)

Jordan argues that the Court should dismiss Count Two of the Indictment because "fuel filter with which [he] has been charged with illegally possessing is not a 'firearm' within the meaning of § 921(a)(25)." (ECF No. 50, p. 19).  Jordan characterizes the "core" of his argument as the Alcohol, Tobacco, Firearms and Explosives' ("ATF") "failure to maintain a consistent position over time" with regards to its technical bulletins. (*Id.* at 19).

19

The Indictment is sufficient to comply with the requirements of Rule 7(c). The Indictment contains the elements of the offense charged. (ECF No. 3); *see also* 18 U.S.C. § 921(a)(3)(C) and 26 U.S.C. §§ 5845(a) and 5861(d). It notifies Jordan of when the alleged unlawful conduct occurred. (*See* ECF No. 3, p. 2 (listing the specific date ("on or about January 14, 2021) when Jordan allegedly engaged in the charged conduct)). It states where the alleged conduct occurred, "in the Western District of Pennsylvania." (*Id.*). These allegations are sufficient to plead proper venue. The Indictment details the alleged unlawful conduct and how it occurred. Count Two alleges that Jordan "did knowingly and unlawfully possess a firearm as defined in [18 U.S.C. § 921(a)(3)(C) and 26 U.S.C. § 5845(a)], and which is further described as a firearm muffler or firearm silencer, which was not registered to him in the National Firearms Registration and Transfer Record." (*Id.*) The Court holds that it sufficiently appraises Jordan of what he must be prepared to meet at trial and allows him to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution. Finally, the Indictment alleges federal court jurisdiction by including language satisfying the interstate or foreign commerce nexus. (*Id.* at 1). Though the Indictment does not specify the exact manner in which interstate or foreign commerce was implicated, it provides Jordan with sufficient information for purposes of Rule 7(c).

Jordan's argument that the item that law enforcement officers seized from his residence is not a firearm silencer or muffler is inappropriate at this stage of litigation. Whether the device is a firearm silencer or muffler within the meaning of 18 U.S.C. § 921(a)(25) is a question for the factfinder. A motion to dismiss an indictment is not the proper stage at which to litigate a factual argument. A ruling on a motion to dismiss is not "a permissible vehicle for addressing the sufficiency of the [G]overnment's evidence." *United States v. DeLaurentis*, 230 F.3d 659, 660–

20

61 (3d Cir. 2000) (internal citations omitted). "Evidentiary questions"—such as credibility determinations and the weighing of proof—"should not be determined at th[is] stage." *United States v. Gallagher*, 602 F.2d 1139, 1142 (3d Cir. 1979). Rather, "[i]n considering a defense motion to dismiss an indictment, the district court [must] accept[ ] as true the factual allegations set forth in the indictment." *United States v. Besmajian*, 910 F.2d 1153, 1154 (3d Cir.1990) (citing *Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n. 16 (1952)).[7] Accepting the facts alleged in the Indictment as true, Count Two of the Indictment is sufficient to comply with the requirements of Rule 7.

### III. CONCLUSION

For the foregoing reasons, the Court will deny Jordan's motion by Order of Court to follow.

BY THE COURT:

_____
WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

4/30/26
_____
Dated

---

[7] Jordan argues that the Indictment must be dismissed due to the ATF allegedly shifting the definition of a firearm silencer/muffler in its technical bulletins. (ECF No. 50, pp. 18-23); (ECF No. 99, pp. 13-16). First, he argues that the ATF's technical bulletins are not entitled to any deference. (*Id.* at 21). Second, Jordan argues that he lacked adequate notice as to what was prohibited due to these allegedly inconsistent positions. (*Id.*). Jordan acknowledges that the controlling statute, 18 U.S.C. § 921(a)(25), has not changed since at least 1992. (*Id.* at 22). The Court expresses no view on the consistency of the ATF's bulletins but notes that any issue related to deference to agency definitions is not appropriate on a motion to dismiss an indictment. Further, the Court does not construe Jordan's brief as raising a vagueness argument with respect to Count Two because Jordan does not allege that any statute is vague. Instead, he takes issue with the ATF's technical bulletins. Jordan's arguments regarding the ATF bulletins are confusing, circular, and fail at this stage of litigation.